

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00112-CV

_____

DAVID A. SKEELS, Appellant

V.

JONATHAN T. SUDER; MICHAEL T. COOKE; AND FRIEDMAN, SUDER &
COOKE, P.C., Appellees

On Appeal from the 236th District Court
Tarrant County, Texas
Trial Court No. 236-284262-16

Before Birdwell and Womack, JJ.; Lee Gabriel (Senior Justice, Retired,
Sitting by Assignment)
Memorandum Opinion on Further Rehearing by Justice Womack
Dissenting Memorandum Opinion on Further Rehearing by Justice Birdwell

**MEMORANDUM OPINION ON FURTHER REHEARING**

On June 17, 2021, we issued a memorandum opinion and judgment on rehearing, affirming the trial court's declaratory judgment based on the application of the Texas Business Organizations Code but modifying the amended final judgment to delete the awards for attorney's fees and costs and for sanctions. Appellant and Appellees filed further motions for rehearing. *See* Tex. R. App. P. 49.5. Although we deny Appellant's further motion for rehearing, we withdraw our June 17, 2021 memorandum opinion and judgment on rehearing and substitute this memorandum opinion and our contemporaneously issued judgment on further rehearing. We deny Appellant's further motion for en banc reconsideration as moot. And we deny Appellees' further motion for rehearing.

## I. INTRODUCTION

This appeal presents the question of the applicability of a corporate entity's shareholder agreement to the entity's right to redeem its shares. We conclude that the plain language of the shareholder agreement at issue is broad, clearly including any actions such as share redemption even though not specifically itemized in the agreement. Thus, we affirm the trial court's declaratory judgment holding as such. But because the awards for sanctions, attorney's fees, and costs are supported by no evidence, we reverse those awards.

## II. Background

### A. Factual Background

#### 1. The Firm Incorporates and Hires Skeels

Appellee Friedman, Suder & Cooke, P.C. ("the Firm") is a Texas professional corporation, which incorporated in December 1992 and is a closely held corporation.[1] *See* Tex. Bus. Org. Code Ann. § 21.563(a). The Firm's articles of incorporation expressly denied preemptive rights to the Firm's shareholders and granted the governing authority sole discretion as to the issuance and disposal of shares:

> Any shares of stock authorized by these Articles or any additional authorized issues of any capital stock, rights or securities convertible into any shares of such stock may be issued and disposed of by the Board of Directors to such persons, firms, corporations or associations for such consideration, upon such terms and in such manner as the Board of Directors may, in its discretion, determine without any offering thereof on the same terms or on any other terms to the shareholders then of record or to any class of shareholders.

*See* Tex. Bus. Org. Code Ann. §§ 21.203, 21.204(b).

In 1993, 1999, and 2002, the Firm amended its articles to reflect the Firm's name changes and to provide that no shares in the corporation had been issued. The 1999 and 2002 amendments were signed by appellee Michael T. Cooke as "President."

---

[1]The Firm began as Friedman & Young, a Professional Corporation, but changed its name twice over the years until it became known as Friedman, Suder & Cooke, P.C. in 2002. The Firm was not formed as a close corporation and, thus, was an ordinary corporation. *See* Tex. Bus. Org. Code Ann. §§ 1.002(8), 3.008, 21.701(1), (3).

Walker C. Friedman, appellee Jonathan T. Suder, and Cooke were considered to be the Firm's "founding shareholders."

In 2007, appellant David A. Skeels began work as an associate attorney at the Firm for its business-litigation group, which was headed by Suder and Cooke. As an associate, Skeels was paid a guaranteed yearly salary with biannual bonuses.

## 2. Skeels Becomes a Shareholder and Shareholder Agreement Signed

In January 2011, Skeels was promoted to shareholder in the Firm and received 1,000 shares. Skeels's compensation scheme changed and became based on a certain percentage of the business-litigation group's net profits with no guaranteed salary.[2] Under the percentage arrangement, the business litigators' recoveries (minus expenses) would be pooled, and each litigator would then receive a percentage, even if that litigator had not worked on every case included in the pool. Skeels received no dividends based on his shares, however. The share certificate, which was issued later but dated in January 2011, reflected that the shares had been "fully paid." *See* Tex. Bus. Org. Code Ann. §§ 21.157(b), 21.162.

That same year, Skeels and Suder tried a patent case ("*Lighting Ballast*"), which Skeels had begun working on while still an associate, that resulted in a $4.5 million jury verdict in favor of the Firm's client. *See Lighting Ballast Control, LLC v. Philips*

---

[2]Although Skeels did not receive a guaranteed salary as a shareholder, he would receive a sporadic monthly "draw" that effectively was an advance on his future percentage of the yearly net profits for the business-litigation group.

4

*Elecs. N. Am. Corp.*, 814 F. Supp. 2d 665, 670, 698 (N.D. Tex. 2011), *rev'd*, 498 F. App'x 986, 987 (Fed. Cir. 2013),[3] *vacated & remanded*, 574 U.S. 1133 (2015), *aff'd*, 790 F.3d 1329, 1333–34 (Fed. Cir. 2015), *cert. denied*, 577 U.S. 1144 (2016).

In early 2014 and while *Lighting Ballast* wended its way through the federal appellate courts, the Firm received notice of an impending IRS audit, and the Firm's bookkeeper recommended that its "record keeping" be shored up. In February 2014 and in an apparent response to the looming audit, the shareholders of the Firm executed a Resolution "to ratify, confirm and memorialize in writing a policy and practice of the Firm, and a right possessed by Walker Friedman, Jonathan Suder and Michael Cooke, before any current shareholder other than Walker Friedman, Jonathan Suder and Michael Cooke became a shareholder in the Firm." The policy and practice that was "resolved" in the Resolution was broadly worded:

> Notwithstanding the number of shareholders, or the number of shares issued to any shareholder, Walker Friedman, Jonathan Suder and Michael Cooke, collectively, have been entitled, and shall continue to be entitled, to take affirmative action on behalf of the Firm, and veto any vote or action taken by or on behalf of the Firm, and/or by any other shareholder, whether individually, or collectively.

Friedman, Suder, and Cooke signed the Resolution in one column; in a separate column, Skeels and the three other shareholders signed it as well. Skeels does not

---

[3]Although the Federal Circuit reheard the panel's decision en banc, the Court reinstated the panel's prior January 2, 2013 decision. 744 F.3d 1272, 1292 (Fed. Cir. 2014) (en banc op. on reh'g).

contend that the Resolution was ambiguous or that he signed it under coercion or duress.

Cooke later stated that the purpose of the Resolution was to ensure that his, Friedman, and Suder's decisions about the management and control of the Firm—"whatever we need to do in the [F]irm"—could not be overturned by a combined vote of the other shareholders, which had been the Firm's prior practice and unwritten policy. In short, the shareholders memorialized that Friedman, Suder, and Cooke were the governing authority for the Firm. *See* Tex. Bus. Org. Code Ann. § 1.002(35)(A) (defining corporation's governing authority as a "group of persons who are entitled to manage and direct the affairs of an entity under this code and the governing documents of the entity"), § 3.101 (providing that a governing authority "manages and directs the business and affairs of the domestic entity"). As characterized by the Firm, the Resolution afforded "the founding shareholders final word in all matters relating to the [F]irm," including the "extinguishment or redemption of non-founding shareholders' shares." Similarly and as we previously quoted, the Firm's articles of incorporation denied the shareholders preemptive rights to their shares and provided that the governing authority could issue and dispose of shares at its discretion.

### 3. Skeels is Fired

In 2015, Skeels's relationship with Suder deteriorated, and Skeels began sending emails to another non-founding shareholder complaining about Suder's work ethic.

Skeels and the other shareholder began talks with another law firm later in 2015 about "exploring other opportunities." Skeels averred that he approached the other law firm as leverage to negotiate a higher percentage share of the profits at the Firm.

In early December 2015, Skeels and the other "younger" shareholders met with Suder and Cooke "to discuss with them some concerns [they] had about the division of profits and the way in which the [F]irm was compensating certain shareholders, particularly in light of how much work [Suder and Cooke] were doing or . . . not doing." Friedman apparently was not part of the meeting because he, Cooke, and Suder "operated internally like two different law firms; Walker Friedman and his group and [Cooke and Suder] separately with their group." It is unclear what the outcome of this meeting was.

On December 11, Suder discovered the emails in which Skeels had groused that Suder was "arrogant," "delusional," and prone to leave the office early.[4] On December 14, the Firm told Skeels that his employment would be terminated at the end of the year and, as part of its "Proposal Regarding Separation," required him to "tender" his shares in the Firm. In the proposal, the Firm stated that it would pay Skeels $50,000 "from the Lighting Ballast matter" once all appeals were exhausted and

---

[4]Although Skeels argues in his briefing that these emails were "private," he sent the emails under his Firm email address via the Firm's computer server.

the Firm received its fees.[5] Skeels asserted that this offer was later increased to $75,000. Without accepting or rejecting the Firm's proposal, Skeels began working for the other law firm he had previously approached. The other shareholder on Skeels's emails was also fired; he began working at the same firm as Skeels.

### 4. The Firm Attempts a Share Redemption

On January 8, 2016, Skeels sent a letter to Cooke seeking "to evaluate and determine [his] rights in connection with [his] involuntary termination" from the Firm and requested multiple documents relating to the Firm's finances and corporate governance. *See id.* § 21.218(b). Skeels stated that once he received the requested information, he would be able to respond to the "proposals concerning my involuntary separation."

The Firm gave Skeels's newly retained attorney ("Attorney One") some of the requested documentation, which the Firm stated was information "given to all [Firm] lawyers at the end of each year." In a letter to Attorney One shortly thereafter, the Firm's attorney formally requested that Skeels "voluntarily surrender his share [certificate] and relinquish all rights, if any, attendant thereto" and issued a notice that his shares would be redeemed on March 11. *See id.* § 21.305. The Firm's attorney explained that the redemption would be priced at "zero," which was authorized by the

---

[5]Skeels asserts that this payment was intended to compensate him for his shares. However, the proposal does not link the $50,000 to the "tender" of Skeels's shares; the $50,000 was mentioned only in connection to the *Lighting Ballast* "proceeds."

Resolution as a governing document or applicable agreement. *See id.* § 303.004(b)(2).

Attorney One, on Skeels's behalf, rejected the Firm's demands.

## B. Procedural Background

### 1. Morphing Allegations and Counterclaim

Skeels filed a verified petition against Suder, Cooke, and the Firm on March 9, 2016, and successfully sought an ex parte temporary restraining order against the Firm's attempt to redeem his share certificate.[6]  Skeels stated that he knew the Firm was "likely to receive . . . a large fee" from *Lighting Ballast* in March or April, which appeared to be one factor in his filing suit quickly.[7]  Against Suder and Cooke, Skeels brought a derivative breach-of-fiduciary-duty claim arising from their decisions to fire Skeels and to withhold "full disclosure."  Skeels also sought a mandamus in order to inspect the Firm's business records and requested several declarations under the Uniform Declaratory Judgments Act (the UDJA) regarding the Firm's allegedly wrongful attempt to redeem Skeels's shares for no compensation based on the Resolution.

Shortly after filing suit, Skeels was interviewed for an article in the *Texas Lawyer* with the headline "Partner Alleges He Was Fired By Firm Before Receiving Big

[6]The trial court later denied Skeels's request for a temporary injunction.

[7]Indeed, the last appellate action in *Lighting Ballast*—the Supreme Court's denial of certiorari—occurred on February 29, and a satisfaction of judgment was executed on March 28.  577 U.S. 1144 (2016).

9

Attorney Fee." The article discussed Skeels's allegations that the Firm, Suder, and Cooke were attempting to divest him of his shareholder interest in the Firm with no compensation and were trying to deny him any interest in the *Lighting Ballast* recovery.

In his first amended verified petition, Skeels reasserted the derivative fiduciary claim against Suder and Cooke and added a direct breach-of-fiduciary-duty claim against them. Against the Firm, Skeels alleged claims for a "wrongful attempt" to redeem Skeels's shares, for violating Skeels's ownership rights in the Firm, and for a breach of the Firm's statutory duty to allow an examination of its business records. Skeels reasserted his UDJA claim regarding the Firm's attempt to redeem his shares.

The Firm, Suder, and Cooke answered the verified petitions and raised affirmative defenses. They also sought sanctions, alleging that Skeels's pleadings were in bad faith, groundless, and had been brought solely for the purpose of harassment. Suder's and Cooke's sanctions requests were specifically sought under Rule 13; the Firm's request was not so limited and cited no supporting authority. *See* Tex. R. Civ. P. 13.

Attorney One then withdrew from his representation of Skeels, and Attorney Two began representing Skeels. Attorney Two filed a second amended petition on Skeels's behalf. This petition omitted most of the factual allegations from the verified petitions and reasserted the requests for mandamus relief to examine the Firm's business records and for declarations regarding the legality of the Firm's share-redemption attempts. Skeels also raised claims for breach of an oral contract and

10

promissory estoppel against the Firm based on his assertion that he had not been paid appropriately in 2016—after he no longer worked for the Firm—under the Firm's profit-sharing agreement with the shareholders. Against Suder and Cooke, Skeels alleged unjust enrichment arising from their conspiracy to "avoid sharing . . . net profits with [Skeels]."

The Firm answered the second amended petition, raising affirmative defenses, and again sought unspecified sanctions against Skeels for his groundless, bad-faith, and harassing pleadings. The Firm also raised a UDJA counterclaim, requesting declarations that the Resolution was a governing document authorizing the Firm's governing authority—Friedman, Suder, and Cooke—to "make any decision . . . with respect to . . . Skeels'[s] status as a shareholder" and that Skeels had been properly terminated as an at-will employee. The Firm pleaded for the recovery of its attorney's fees and costs as authorized under the UDJA. Suder and Cooke also answered, alleging affirmative defenses, and again sought sanctions under Rule 13; they did not allege a counterclaim.

### 2. Unsuccessful Summary Judgment and Discovery

The Firm, Suder, and Cooke moved for partial summary judgment on Skeels's contractual and quasi-contractual claims—breach of an oral contract, promissory estoppel, and unjust enrichment. They did not seek summary judgment on their or Skeels's declaratory-judgment requests. Attorney Two sought leave to file a third amended petition "to allow additional causes of action based on actions that occurred

11

in December, 2016." The trial court denied both the summary-judgment motion and the motion for leave.

During discovery, the parties entered into an agreement under which the Firm agreed to provide its business records for fiscal year 2016. *See* Tex. R. Civ. P. 11. After Skeels unsuccessfully attempted to designate himself as a witness regarding share valuation and his damages, Skeels served his expert designation in which he disclosed that A. Lamar Casparis would testify as to the appropriate valuation of Skeels's shares in the Firm. The Firm, Suder, and Cooke moved to exclude Casparis's testimony because his opinion would be irrelevant—the Resolution allowed the Firm to value the shares as it saw fit.[8]

### 3. Declaratory Judgment

The trial court set the case for a September 11, 2017 trial. During the September 8 pretrial hearing, the parties argued the effect of the Resolution and whether its scope and interpretation were issues of law or fact. The trial court orally ruled at the hearing "that the shareholder agreement [i.e., the Resolution] controls," obviating the need for a valuation expert. *See* Tex. R. Civ. P. 166(g), (p). Accordingly, the trial court granted the Firm, Suder, and Cooke's motion to exclude Casparis's testimony. *See* Tex. R. Civ. P. 166(a).

---

[8]They also attacked Casparis's methodology.

12

Based on the trial court's rulings at the pretrial hearing, Skeels recognized that his claim for declaratory judgment had been effectively dismissed. On the first day of trial, the Firm requested that the trial court grant its UDJA counterclaim based on the trial court's legal ruling during the pretrial hearing regarding the effect of the Resolution. The trial court signed an order denying Skeels's UDJA claim and granting the Firm's UDJA counterclaim and declared that the Resolution was a governing document that authorized all of the Firm's actions. The "issue of attorney's fees and costs related [to] the granting of this Declaratory Judgment" was expressly reserved for a later date. The trial court then recessed the trial for one week.

### 4. Sanctions, Attorney's Fees, and Final Judgment

When the trial continued, Attorney Two asserted that Skeels would not proceed on his remaining claims, based on what Attorney Two determined was the trial court's effective denial of those claims in its UDJA ruling, and that the only remaining issues were the Firm's, Suder's, and Cooke's requests for sanctions and the Firm's request for UDJA fees and costs. The trial court then held an evidentiary hearing.

The trial court entered findings of fact and conclusions of law, concluding that $20,000 in sanctions against Skeels personally should be awarded to Suder and Cooke based on Rule 13 and under Chapter 10 of the Civil Practice and Remedies Code because Skeels's pleadings were "groundless," were brought in "bad faith," were harassing, "lacked evidentiary support," and were brought "for an improper purpose."

13

*See* Tex. Civ. Prac. & Rem. Code Ann. § 10.004; Tex. R. Civ. P. 13; *see also* Tex. R. Civ. P. 296.

The sanctions award was traced back to Skeels's pleadings and litigation conduct. The trial court found that Skeels's verified petitions (as well as the *Texas Lawyer* article) contained unnecessary personal attacks and disclosed confidential client information surrounding *Lighting Ballast*. The fiduciary-duty claims in Skeels's superseded petitions and the contractual and quasi-contractual claims in the second amended petition were found to be groundless in part because Skeels had been an at-will employee. Regarding the second amended petition, the trial court found that Skeels's unjust-enrichment claim was frivolous because it was untethered to any other claim against Suder and Cooke or to an attempt to pierce the Firm's corporate veil. The trial court also found Skeels's requests to inspect the Firm's business records to be groundless and harassing because it was not tied to another cause of action and was an attempt to recover attorney's fees for a remedy that was easily achieved through the discovery rules. The trial court found that Skeels's "specific animus for Suder" (shown through Skeels's emails while still employed at the Firm and through Skeels's testimony at the sanctions hearing) led to Skeels's filing suit for an improper, harassing purpose. Also persuasive to the trial court was its finding that Skeels was a licensed attorney, its finding that Skeels delayed seeking discovery for eleven months after filing suit, Skeels's testimony that he had no regrets about the manner in which his suit proceeded, and the trial court's "inference that Skeels asserted the baseless

14

claims to coerce Defendants to settle because he did not have a way to compel payment for his shares."

The trial court also addressed attorney's fees and costs in its findings and conclusions, awarding the Firm $75,000 in reasonable and necessary attorney's fees and $12,500 in costs, both regarding the UDJA claim. The trial court awarded "$25,000 in expenses incurred by [the Firm, Suder, and Cooke] in this matter, including retaining an expert to rebut the positions of . . . Casparis, who was stricken by order of the Court."

The trial court then entered a final, take-nothing judgment on Skeels's claims based on its prior order granting the Firm's UDJA counterclaim. The trial court granted the Firm's, Suder's, and Cooke's motions for sanctions, awarding $20,000 against Skeels, and awarded the Firm, Suder, and Cooke $100,000 in attorney's fees and costs related to the declaratory judgment. In its judgment, the trial court recognized that after its declaratory-judgment order in favor of the Firm, Attorney Two had "represented that none of [Skeels's] claims remained to be tried to a jury," thereby "conced[ing] [that] judgment against [Skeels] on all of [Skeels's] claims was proper."

### 5. Post-Judgment Proceedings and Amended Final Judgment

Skeels filed a pro se,[9] verified motion for new trial or to modify the judgment and argued that the trial court erred by excluding his evidence of share valuation and by concluding that the Resolution governed and authorized the Firm's share redemption. He also argued that sanctions against him based on Attorney One's conduct was in error.

Although the trial court held a hearing on Skeels's new-trial motion, it was overruled by operation of law. *See* Tex. R. Civ. P. 329b(c). The trial court did, however, sign an amended final judgment, clarifying the attorney's-fees and sanctions awards:

> [The Firm] shall recover from [Skeels] $100,000.00 in attorneys' fees and costs related to the granting of the . . . Declaratory Judgment.
>
> . . . Suder['s] and Cooke's Motion[s] for Sanctions [are] granted and . . . Suder and Cooke shall each recover from [Skeels] $10,000.00 as a sanction against [Skeels] pursuant to the Court's Findings of Fact and Conclusions of Law.

The trial court did not award the Firm sanctions. The remainder of the amended final judgment tracked the original judgment, including the trial court's recognition that "none of [Skeels's] claims remained to be tried to a jury" and that "judgment against [Skeels] on all of [his] claims was proper" based on the declaratory judgment.

---

[9]Attorney Two was granted leave to withdraw from her representation of Skeels after the trial court entered final judgment.

16

Skeels filed a motion for new trial or to modify the amended final judgment, raising essentially the same grounds as were in his prior postjudgment motion. The motion was overruled by operation of law.

### III. DISCUSSION

## A. Declaratory Judgment

### 1. Declaration Regarding Effect of Resolution

#### a. Standard of Review

Skeels first contends that the trial court's declaratory judgment that the Resolution authorized the Firm's redemption of Skeels's shares was in error. We review a declaratory judgment under the same standards as other judgments and look to the procedure used to resolve the issue in the court below to determine the appropriate standard of review. *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.010; *Waldrop v. Waldrop*, 552 S.W.3d 396, 401 (Tex. App.—Fort Worth 2018, no pet.) (en banc op. on reconsideration); *Solar Soccer Club v. Prince of Peace Lutheran Church of Carrollton*, 234 S.W.3d 814, 820 (Tex. App.—Dallas 2007, pet. denied). Here, the trial court determined the import of the Resolution to Skeels's claims at a pretrial hearing, which the parties recognized essentially disposed of Skeels's claims against the Firm, Suder, and Cooke. Accordingly, the ruling was "akin to a summary judgment or directed verdict," which we review de novo as a matter of law. *JPMorgan Chase Bank, N.A. v. Orca Assets G.P.*, 546 S.W.3d 648, 653 (Tex. 2018). As in a directed-verdict review, we may affirm the declaratory judgment on any ground that supports it. *See*

*RSL–3B–IL, Ltd. v. Prudential Ins. Co. of Am.*, 470 S.W.3d 131, 136 (Tex. App.—Houston [1st Dist.] 2015, pet. denied); *Westchester Fire Ins. Co. v. Admiral Ins. Co.*, 152 S.W.3d 172, 191 (Tex. App.—Fort Worth 2004, pet. denied) (en banc op. on reh'g).

### b. The Applicable Statutes

Corporate share redemption is addressed in the Business Organizations Code (the BOC). Such redemptions "take[] effect by call and written notice of the redemption of the shares," and a notice must state several statutory specifics.[10] Tex. Bus. Org. Code Ann. §§ 21.304–21.305. Additionally, if an owner of a professional entity "ceases to be an authorized person," the entity is to purchase the ownership interest and "may" provide the "price and terms" of purchase in its governing documents. *Id.* § 301.008(b), (d). The BOC further allows a corporation's governing documents or an applicable agreement to address share redemption:

> (a) A professional corporation may redeem shares of a shareholder, including a deceased shareholder.
>
> (b) The price and other terms of a redemption of shares may be:
>
>> (1) agreed to between the board of directors of the professional corporation and the shareholder or the shareholder's personal representative; or
>>
>> (2) specified in the governing documents of the professional corporation or an applicable agreement.

*Id.* § 303.004.

---

[10]The Firm asserts that it complied with the call-and-notice mandates of Sections 21.304 and 21.305 in redeeming Skeels's shares.

However, the BOC in Chapter 21, Subchapter C, also grants shareholders broad authority to enter into written agreements that control corporate governance:

The shareholders of a corporation may enter into an agreement that . . .

. . . .

. . . governs, in general or with regard to specific matters, the exercise or division of voting power by and between the shareholders, directors, or other persons, including use of disproportionate voting rights or director proxies; [or]

. . . otherwise governs the exercise of corporate powers, the management of the business and affairs of the corporation, or the relationship among the shareholders, the directors, and the corporation as if the corporation were a partnership or in a manner that would otherwise be appropriate only among the partners and not contrary to public policy.

Tex. Bus. Org. Code Ann. § 21.101(a)(7), (12). This statutory authorization validates shareholder agreements even if they are otherwise "inconsistent" with the BOC. *Id.* § 21.104; *see also id.* § 21.110 (providing provisions governing shareholder agreements in Chapter 21, Subchapter C, do not "prohibit or impair any agreement between two or more shareholders"); *Batey v. Droluk*, No. 01-12-01058-CV, 2014 WL 1408115, at *9 (Tex. App.—Houston [1st Dist.] Apr. 10, 2014, no pet.) (mem. op.) (recognizing the BOC contemplates that its provisions may be limited by a shareholder agreement). Thus, a shareholder agreement, signed by all shareholders and "made known" to the corporation, governs corporate action notwithstanding a contrary provision in the BOC. Tex. Bus. Org. Code Ann. § 21.101(b)(1)(B). And shareholders are, therefore, free to agree to stricter or more lenient rights than those provided in the BOC. *See,*

19

*e.g.*, *Ritchie v. Rupe*, 443 S.W.3d 856, 881 (Tex. 2014). Accordingly, the terms of any share redemption may be provided in a governing document or an applicable agreement among the members, even if the document or agreement is broader or narrower than the dictates of the BOC. *See id.*; 1 Greg Abbott & Doug Coulson, *Texas Practice Guide: Business and Commercial Litigation* § 3:74 (2020). *See generally* Elisabeth de Fontenay, *Individual Autonomy in Corporate Law*, 8 Harv. Bus. L. Rev. 183, 189 (2018) ("[O]rganizational law facilitates business enterprise and encourages investment by dramatically reducing the transaction costs (including negotiation costs and information costs) of forming, operating, and governing business entities, while at the same time affording the parties considerable freedom to set their own terms.").

### c. Application

Skeels asserts that the Resolution was an "unremarkable delegation of authority to the founding shareholders to manage the day-to-day affairs of the Firm" and could not be interpreted to include "additional redemption-related characteristics." Skeels contends that although the BOC grants corporations the right to compel the redemption of shares, the price and other terms of such redemption must be specifically provided in a governing document or applicable agreement under Section 303.004. Skeels recognizes that the language of Section 303.004(b) is permissive but asserts that the term "redemption" is necessarily conditioned on specified redemption terms, which are not included in the Resolution. *See generally* Tex. Gov't Code Ann. § 311.016 (providing "may" is permissive unless "the context in which the word or

phrase appears necessarily requires a different construction"); Tex. Bus. Org. Code Ann. § 1.051 (providing Chapter 311 of the Government Code applies to the construction of the BOC). According to Skeels, the "interdependence" between a redemption and an advance arrangement on price is further "confirmed" by the call-and-notice provisions in Section 21.304(c). Tex. Bus. Org. Code Ann. § 21.304(c). In sum, Skeels argues that the Resolution cannot be considered a governing document or applicable agreement regarding share redemption because of the Resolution's lack of detail regarding the terms of redemption.

We disagree. Skeels does not argue that the Resolution is ambiguous; thus, we interpret it based on its plain language. *See URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 763–64 (Tex. 2018); *Lyons v. Montgomery*, 701 S.W.2d 641, 643 (Tex. 1985); *Herring Bancorp, Inc. v. Mikkelsen*, 529 S.W.3d 216, 224 (Tex. App.—Amarillo 2017, pet. denied) (op. on reh'g). The unambiguous Resolution is broadly worded and allows Friedman, Suder, and Cooke to take "affirmative action" on behalf of the Firm with no limitation placed on that power. All shareholders had signed the written Resolution, and the Resolution had been made known to the corporation—the Firm. *See* Tex. Bus. Org. Code Ann. § 21.101(b)(1)(B); *cf. Sanders v. McMullen*, 868 F.2d 1465, 1468 (5th Cir. 1989) (holding notice of shareholder agreement insufficient under statutory predecessor to BOC because "other shareholders existed who were totally unaware of the agreement"); *R. H. Sanders Corp. v. Haves*, 541 S.W.2d 262, 265 (Tex. App.—Dallas 1976, no writ) (concluding notice requirements for shareholder

21

agreements under statutory predecessor to BOC sufficiently met because all shareholders had knowledge of the agreement, meeting the notice requirements' purpose). Although the circumstances surrounding the formation of the Resolution may be used to aid construction of its unambiguous language, *see First Bank v. Brumitt*, 519 S.W.3d 95, 110 (Tex. 2017), restricting the scope of the Resolution based on the circumstance of the Firm's audit would incorrectly narrow the Resolution's broad language to exclude share redemption (and, presumably, most other actions taken by the governing authority under the Resolution not directly referrable to the audit). In short, inferring a narrow intent from the circumstances surrounding the formation of the unambiguous, expansive shareholder agreement would impermissibly alter it. *See URI*, 543 S.W.3d at 757–58, 767–69. Further, the surrounding circumstances do not clearly indicate that share redemption was intended to be excluded from the scope of the Resolution. *See, e.g.*, *Piranha Partners v. Neuhoff*, 596 S.W.3d 740, 752 (Tex. 2020).

Section 303.004, which is plainly permissive, does not mandate that such a broadly worded agreement must expressly provide for share redemption. A contrary interpretation of Section 303.004 would eviscerate the far-reaching authority granted to a corporation's shareholders in Section 21.101(a), which applies even if the Resolution were inconsistent with the BOC, and would ignore the clear permissive language used by the Legislature. *See* Tex. Bus. Org. Code Ann. §§ 21.101, 21.104; *Ritchie*, 443 S.W.3d at 881. Nothing in the context of Section 303.004 indicates that the Legislature intended these permissive provisions to be mandatory such that a

22

shareholder agreement could not provide otherwise, especially in light of the fact that the Legislature expressly provided that shareholder agreements could be "inconsistent" with other BOC provisions. Tex. Bus. Org. Code Ann. § 21.104; *see also id.* § 21.110; Tex. Gov't Code Ann. § 311.016(1); *Ritchie*, 443 S.W.3d at 881; *Hernandez v. Ebrom*, 289 S.W.3d 316, 318 (Tex. 2009).

Similarly, Section 301.008 does not dictate a different conclusion. A purchase of an ownership interest is required if a member ceases to be an authorized person, and the terms of such purchase may be provided in the governing documents or an applicable agreement among the members. Tex. Bus. Org. Code Ann. § 301.008(c). Here, the shareholders, including Skeels, agreed that Friedman, Suder, and Cooke would be the Firm's governing authority and that they could take affirmative action on the Firm's behalf, which would necessarily include share redemption from an unauthorized person and its terms. The Resolution's failure to specify the terms upon which share redemption could be accomplished does not mean that the Resolution excluded or could not apply to share redemption. *Cf. id.* § 21.101(a)(7) (recognizing shareholder agreement may govern the exercise of voting power "in general or with regard to specific matters"). In our view, the Resolution's broad language allowed the governing authority to set the terms of any share redemption as it saw fit. Indeed, shareholders may agree to terms even if inconsistent with the BOC, including the share-redemption provisions on which Skeels relies. *See id.* §§ 21.104, 21.110.

23

Again, the shareholders of the Firm all signed the Resolution, which granted Friedman, Suder, and Cooke—the agreed governing authority for the Firm—the unfettered right to take "affirmative action" on the Firm's behalf. Skeels admits that he voluntarily signed the Resolution, that it was unambiguous, and that it made Friedman, Suder, and Cooke the Firm's governing authority. Although the Resolution is not specific to share redemption, we find nothing in the expansive provisions of Sections 21.101, 21.104, and 21.110 (all included in Subchapter C of Chapter 21) that require a shareholder agreement to expressly refer to the permissive redemption options delineated by Section 303.004 or the permissive price-and-terms provision of Section 301.008. The Firm notified Skeels that it would redeem his shares for zero dollars, which it was authorized to do under the Resolution.[11] As the trial court concluded, the Resolution "controls" and authorized the Firm's actions surrounding Skeels's dismissal from the Firm. This result was clearly contemplated by the Legislature in granting corporate founders and owners far-reaching rights to govern themselves:

> Of course, shareholders may also prevent and resolve common disputes by entering into a shareholders' agreement to govern their respective rights and obligations. Importantly the Legislature has granted corporate founders and owners broad freedom to dictate for themselves the right, duties, and procedures that govern their relationship with each other and with the corporation. . . . Again, we note that although [the corporation's] owners did not enter into a shareholders' agreement, they

---

[11]Additionally, the Firm's articles of incorporation authorized the governing authority to issue and dispose of shares at its sole discretion.

24

certainly could have done so, and by doing so could have avoided the current dispute.

*Ritchie*, 443 S.W.3d at 881. And the dissent recognizes that the intent of the Resolution was to avoid the type of dispute we are presented with today.

Skeels contends that the Resolution cannot be considered an enforceable, valid shareholder agreement because "there is no indication that the shareholders received any consideration for signing it and ceding their voting power to the founding shareholders." As the Firm points out, however, a written agreement presumes consideration for its execution; thus, Skeels was required to rebut this presumption. *See TLC Hosp., LLC v. Pillar Income Asset Mgmt., Inc.*, 570 S.W.3d 749, 761 (Tex. App.—Tyler 2018, pet. denied); *City of The Colony v. N. Tex. Mun. Water Dist.*, 272 S.W.3d 699, 725 (Tex. App.—Fort Worth 2008, pet. dism'd); *Franklin v. Jackson*, 847 S.W.2d 306, 310 (Tex. App.—El Paso 1992, writ denied). Skeels did not specifically plead or otherwise give fair notice that there was a lack of consideration to support the shareholder agreement in answer to the Firm's counterclaim or in his request for declaratory relief.[12] *See* Tex. R. Civ. P. 45(b), 47(a), 93(9). *See generally*

---

[12]We agree with the Firm that Skeels's isolated statement at the temporary-injunction hearing—the Resolution was not a shareholder agreement partially because "it doesn't recite any consideration"—did not sufficiently and fairly provide notice that he was attempting to rebut the consideration presumption, especially because this statement was untethered to a pleading allegation. And, as noted by the Firm in its response to Skeels's motion for further rehearing, Skeels's consideration argument "was never really intended to be a focus of Skeels'[s] appeal," having "received the attention of two sentences in Skeels'[s] opening brief, a footnote in [the Firm's]

25

*Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 896 (Tex. 2000) ("Texas follows a 'fair notice' standard for pleading, which looks to whether the opposing party can ascertain from the pleading the nature and basic issues of the controversy and what testimony will be relevant.").

Skeels urges that a lack of consideration may be argued even in the absence of a specific, verified pleading because the issue "appear[ed] of record." Tex. R. Civ. P. 93(9). But because a written contract presumes consideration for its execution, a lack of consideration for the Resolution would not be apparent from the record and would require a specific pleading even under Rule 93. *See Est. of Griffin v. Sumner*, 604 S.W.2d 221, 228 (Tex. App.—San Antonio 1980, writ ref'd n.r.e.); *cf. Nootsie, Ltd. v. Williamson Cnty. Appraisal Dist.*, 925 S.W.2d 659, 662 (Tex. 1996) ("We have not hesitated in previous cases to hold that parties who do not follow rule 93's mandate waive any right to complain about the matter on appeal. . . . Here Nootsie first questioned the district's capacity in its briefing before this Court. Therefore, Nootsie has waived its complaint about capacity."); *ACI Design Build Contractors Inc. v. Loadholt*, 605 S.W.3d 515, 519 (Tex. App.—Austin 2020, pet. denied) (applying *Nootsie*).

Skeels also seems to argue that the Resolution was against public policy and, therefore, was void under Section 21.101 because it allowed the Firm's governing authority—Friedman, Suder, and Cooke—to breach owed fiduciary duties to the

response brief[,] and zero mention in Skeels'[s] reply brief." [Citations to referenced filings omitted.]

26

minority shareholders. *See, e.g.*, Tex. Bus. Org. Code Ann. § 21.101(a)(12). However, the Firm cogently argues that the Resolution did not violate public policy because it was "an agreement among shareholders: a) who are lawyers specialized in handling highly technical commercial and intellectual property matters; and b) in which the three founding shareholders desired the ability to control who among [the] junior lawyers . . . join and remain in the law firm." The BOC expressly contemplates allowing shareholders to mutually and expansively agree to governance and business matters. *See, e.g., id.* §§ 21.101, 21.104; *Tex. Com. Bank, N.A. v. Grizzle*, 96 S.W.3d 240, 250 (Tex. 2002) ("[T]he State's public policy is reflected in its statutes."). Merely because the Resolution was broader than Skeels would now wish does not render it against public policy under the facts presented. *See generally Fortis Benefits v. Cantu*, 234 S.W.3d 642, 649 (Tex. 2007) (emphasizing State's public policy in favor of the right to contract); *Indian Oil Co. v. Bishop Petroleum Inc.*, 406 S.W.3d 644, 649 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (recognizing purpose of rule voiding contracts that violate public policy is "not to protect or punish either party to the contract, but to benefit and protect the public").

We conclude that the Resolution was a compliant shareholder agreement that broadly allowed the Firm's governing authority to act on behalf of the Firm, including the actions taken surrounding Skeels's discharge from the Firm. We overrule Skeels's first and second issues.

### 2. Attorney's Fees and Costs

Attorney's fees and costs are authorized in a UDJA action if such an award is equitable and just and if the amount is reasonable and necessary. *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.009. Whether such an award is equitable and just is a question of law, and we review a trial court's equitable-and-just determination for an abuse of discretion. *See City of Lorena v. BMTP Holdings, L.P.*, 409 S.W.3d 634, 646 (Tex. 2013) (citing *Bocquet v. Herring*, 972 S.W.2d 19, 20–21 (Tex. 1998)). We also review the reasonableness and necessity of such awards, which are questions of fact, for an abuse of discretion. *See Morath v. Tex. Taxpayer & Student Fairness Coal.*, 490 S.W.3d 826, 885 (Tex. 2016). For the following reasons, we sustain Skeels's fourth issue.

### a. Equitable and Just

Skeels contends that the fees-and-costs award was neither equitable nor just because the Firm's requested declaratory relief "mirrored Skeels's own": "[T]here is no more blatant abuse of the [U]DJA than requesting declarations that merely mirror previously-filed affirmative claims, all in an effort to obtain fees that otherwise would be unrecoverable."

A "counterclaim that presents no new controversy, but exists solely to pave the way to an award of attorney's fees is improper." *Howell v. Mauzy*, 899 S.W.2d 690, 706 (Tex. App.—Austin 1994, writ denied). Thus, the UDJA is generally not available to settle disputes that are already pending. *BHP Petroleum Co. v. Millard*, 800 S.W.2d 838, 841 (Tex. 1990) (orig. proceeding). But this rule, sometimes referred to as the mirror-

28

image rule, has exceptions. *See McGehee v. Endeavor Acquisitions, LLC*, 603 S.W.3d 515, 529 (Tex. App.—El Paso 2020, no pet.). Once a plaintiff seeks declaratory relief, for example, the mirror-image rule does not prevent the trial court from awarding attorney's fees even if the defendant's declaratory counterclaim merely duplicates the plaintiff's claim. *See Save Our Springs All., Inc. v. Lazy Nine Mun. Util. Dist.*, 198 S.W.3d 300, 318 (Tex. App.—Texarkana 2006, pet. denied). This exception is founded on the recognition that a fees-and-costs award under the UDJA may be awarded to a nonprevailing party:

> [B]ecause the UDJA authorizes the trial court to determine that it is equitable and just to award attorney's fees to *either* party, . . . a defendant that raises a mirror-image counterclaim in response to the plaintiff's declaratory-judgment claim cannot be said to have raised the counterclaim solely to pave the way for an award of otherwise-impermissible attorney's fees.

*Wash. Square Fin., LLC v. RSL Funding, LLC*, 418 S.W.3d 761, 776 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (citing *Save Our Springs*, 198 S.W.3d at 318); *see also Morath*, 490 S.W.3d at 885; *Ridge Oil Co. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 162 (Tex. 2004).

Here, the Firm raised its UDJA counterclaim in response to Skeels's second amended petition. Because Skeels had already invoked the UDJA against the Firm, we cannot conclude that the Firm asserted its counterclaim solely to authorize a fees-and-costs award. *Wash. Square*, 418 S.W.3d at 776. Thus, the Firm's request for fees

29

and costs would not be barred under the UDJA and was equitable and just. *See McGehee*, 603 S.W.3d at 529.

### b. Reasonable and Necessary

### (1.) Legal Sufficiency

Skeels next argues that the trial court abused its discretion by awarding the Firm $100,000 in attorney's fees and costs related to its successful UDJA counterclaim because it submitted no evidence to support the awarded amount. If a trial court's award of fees and costs under the UDJA is supported by no or insufficient evidence, it is an abuse of discretion. *See Bocquet*, 972 S.W.2d at 21; *see also Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 490 (Tex. 2019) ("[W]e evaluate whether legally sufficient evidence supports that the amount of attorney's fees awarded is reasonable and necessary for the legal representation, so that a fee-shifting award will compensate the prevailing party generally for its losses resulting from the litigation process."). The party seeking such fees and costs carries the burden of proof to support the award. *See Yowell v. Granite Operating Co.*, 620 S.W.3d 335, 354 (Tex. 2020); *Kinsel v. Lindsey*, 526 S.W.3d 411, 427 (Tex. 2017).

The Firm alone alleged the UDJA counterclaim against Skeels and sought its fees and costs under that statute. *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.009; *see also Spicer, Tr. for Est. of Brady v. Maxus Healthcare Partners, LLC*, 616 S.W.3d 59, 127–29 (Tex. App.—Fort Worth 2020, no pet.) (op. on reh'g) (recognizing attorney's-fee award must be supported by specific, fair-notice pleading that raises grounds to

recover fees and costs). One week after the trial court granted declaratory judgment in favor of the Firm, the trial reconvened ("the reconvened hearing"). From the start of the reconvened hearing, it was unclear what was being addressed, but the Firm's attorney stated that the Firm wanted to put on evidence "about the bad faith nature of this lawsuit from the beginning . . . and what that's cost us in terms of attorneys' fees." To that end, the Firm proffered one witness: Suder. Suder testified that the Firm's attorney, whose hourly rate was $450, sent the Firm a bill for $75,000 in attorney's fees, which the Firm paid.[13] Suder testified to the tasks the Firm's attorney had performed on the Firm's behalf:

> [The Firm's attorney] attended every hearing. He attended every deposition. He prepared for those. He prepared for trial. He drafted letters. He took the lead on some discovery conferences. And a lot of what he did was review all work product and reviewed it and then edited so that it could be filed. A lot of it was filed under his signature.

Suder stated with no elaboration that the charged amount was reasonable and necessary. The Firm also paid its attorney's costs, which totaled "[a]pproximately $25,000" and consisted of "[d]eposition costs, copy costs, court reporter fees, our expert, our rebuttal expert . . . in connection with the response to Mr. Casparis's

---

[13]Suder also testified that he and Cooke spent "a general estimate" of 200 hours, which would have been billed at $550 per hour, performing legal tasks "on behalf of the law firm . . . in defense of Mr. Skeels'[s] lawsuit." We question, as did the trial court, whether Suder and Cooke could recover attorney's fees for work they performed on the Firm's behalf, as opposed to fees for work they performed pro se for their own defenses. Suder and Cooke never appeared as attorneys of record for the Firm. We need not decide that issue today, however, because we conclude that the Firm's evidence of its UDJA fees and costs was legally insufficient.

report, [and] filing fees." The trial court's findings and conclusions referred to this evidence, and the trial court awarded the Firm $100,000 in attorney's fees and costs "related to the granting of the . . . Declaratory Judgment."[14]

The record is clear, however, that the Firm's evidence was not admitted for the purpose of establishing fees and costs under the UDJA. Throughout Suder's testimony, Attorney Two consistently and repeatedly objected to Suder's testimony regarding the Firm's fees and costs, arguing that the Firm had never previously disclosed its evidence to Skeels. The Firm's attorney affirmatively disclaimed that the Firm's fees-and-costs evidence related to a UDJA award:

> [The Firm does not] need [to have disclosed its evidence of fees and costs] for the purposes of what we're doing here. This is not something where we're going to the jury asking for a finding in connection with a claim that was made to support attorneys' fees.
>
> We're putting on evidence of costs associated with the bringing and maintaining of this lawsuit which [the Firm] has incurred. So the Court can take that into consideration if the Court decides to issue a sanctions order. And if so, how much? That's just different.

Cooke, during his questioning of Suder, similarly denied that the fees-and-costs evidence was proffered for any purpose other than sanctions:

> [The Firm's attorney] described our position of why [the disclosure requirements are] not applicable in this particular case. So it goes to the issue of this is not a claim for attorneys' fees tied to a cause of action for

---

[14]The trial court stated at the hearing on Skeels's motion for new trial or modified judgment that the $100,000 award was derived from Suder's testimony that the Firm's attorney had charged the Firm "$75,000 worth of time and $25,000 worth of costs."

32

which there is fee recovery. It's for a different purpose that we've said several times now.

And the trial court expressly admitted the fees-and-costs evidence solely in the context of sanctions: "With that limitation then, I'll permit [the Firm's attorney] to continue." Indeed, the amended final judgment indicated that only the sanctions requests were heard at the reconvened hearing: "[At the reconvened hearing,] the Court heard evidence and argument on Defendants' Motions for Sanctions and by separate document has made corresponding Findings of Fact and Conclusions of Law related to its order on Defendants' Motions for Sanctions."

Later, Skeels clearly pointed out at the new-trial hearing that the issue of the Firm's entitlement to attorney's fees under the UDJA had not been tried at the reconvened hearing. He referred the trial court to the clear disclaimer by the Firm's attorney at the reconvened hearing. On that basis, Skeels asserted that the trial court should have awarded no fees or costs under the UDJA. Interestingly, the Firm's attorney did not assert at the new-trial hearing that the Firm had proved its fees and costs under the UDJA; he argued that any fees and costs that had been awarded under the UDJA could be "fix[ed]" by "mov[ing] that over under the blank for sanctions."[15] The Firm's attorney also represented that the UDJA fees and costs had been included

---

[15]We note that even in the context of attorney's fees awarded as a sanction, such amount must be proven to be reasonable through evidence substantiating the reasonable hours worked and the reasonable hourly rate. *See Nath v. Tex. Children's Hosp.*, 576 S.W.3d 707, 709–10 (Tex. 2019).

33

in the Firm's proposed judgment only because the trial court had asked that the issue be included, not because the Firm had sought and proved UDJA fees and costs at the reconvened hearing.

Under these facts, we cannot conclude that evidence specifically adduced and admitted for the limited purpose of crafting an appropriate sanction could also be considered lodestar evidence to establish attorney's fees for a UDJA claim, especially when that evidence had not been previously disclosed, did not meet the lodestar considerations, and was explicitly and undisputedly admitted to address only sanctions. *See Peaster ISD v. Glodfelty*, 63 S.W.3d 1, 10 (Tex. App.—Fort Worth 2001, no pet.) ("[E]vidence specifically offered only for a limited purpose remains subject to its limited purpose; consequently, such evidence is simply not probative evidence of any other fact." (citing *Davis v. Gale*, 330 S.W.2d 610, 612–13 (Tex. 1960))); *see also* Tex. R. Evid. 105(a) (requiring trial court to "restrict evidence to its proper scope" if admissible for one purpose but not admissible for another); *Intercont'l Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 658–59 (Tex. 2009) (holding appellant did not preserve issue directed to absence of attorney's-fee award because no jury question submitted on the issue and because appellant only asserted post-verdict that the issue could be "fixed by the court").

### (2.)  Remedy

Although we have concluded that the evidence was legally insufficient to support a fees and costs award under the UDJA, we must determine the appropriate

34

remedy. Skeels argues that he is entitled to a take-nothing judgment on the Firm's fees-and-costs request under the UDJA or, "at the very least, . . . a remand for a jury trial." The Texas Supreme Court has held that when the evidence is legally insufficient to support a fees-and-costs award under the UDJA, the appropriate remedy is to remand the issue to the trial court for a redetermination of reasonableness and necessity. *Rohrmoos*, 578 S.W.3d at 505–06; *see also Long v. Griffin*, 442 S.W.3d 253, 256 (Tex. 2014).

We find *Rohrmoos* distinguishable from the facts presented here. In *Rohrmoos* (and in other cases that remand the reasonableness issue to the trial court), the prevailing party introduced its evidence specifically to prove attorney's fees based on a cause of action providing for those fees, not to prove sanctions. *Rohrmoos*, 578 S.W.3d at 503–06; *see also Kinsel*, 526 S.W.3d at 428; *Long*, 442 S.W.3d at 255–56; *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 764 (Tex. 2012); *Boyaki v. John M. O'Quinn & Assocs., PLLC*, No. 01-12-00984-CV, 2014 WL 4855021, at *15–16 (Tex. App.—Houston [1st Dist.] Sept. 30, 2014, pet. denied) (mem. op.). The Supreme Court found the evidence legally insufficient to support the awarded amount because the fees evidence was too generalized to meet the lodestar standard. *Rohrmoos*, 578 S.W.3d at 505. In short, the prevailing party's evidence lacked "the requisite details." *Id.* at 506.

Here, however, the Firm proffered no evidence to support its fees and costs under the UDJA and clearly stated its intention to seek only sanctions, not UDJA attorney's fees and costs. The Firm then proffered evidence of what it had paid to

defend itself against Skeels's allegedly groundless claims, which the trial court admitted only for that limited purpose. The Firm unswervingly disclaimed any intent to proffer fees-and-costs evidence for purposes of the UDJA, and the Firm did not dispute that it had never disclosed its attorney's-fee evidence to Skeels. In the absence of any evidence of fees and costs, the trial court nevertheless made such an award under the UDJA.[16] The awarded fees and costs do not fail because the evidence lacks the "requisite details"; the award fails because the Firm offered no evidence at all while asserting it was not seeking UDJA fees and costs. *Id.*; *cf. Intercont'l Grp.*, 295 S.W.3d at 659 (holding appellant waived its right to recover contractual attorney's fees because it did not plead for contractual fees, did not seek to amend its pleadings to do so, and did not submit a jury question on the issue); *Spicer*, 616 S.W.3d at 129–30 (reforming judgment to delete fees and costs award because prevailing party did not plead for such recovery).

When there is a complete absence of a vital fact, the evidence is legally insufficient, and the appropriate remedy is to render the judgment that should have been rendered. *See City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005); *Garza v.*

---

[16]At first blush, it would appear that the trial court's judgment could have been interlocutory because the issue of fees and costs under the UDJA had not been tried. But the trial court actually disposed of the fees and costs issue in its findings and conclusions and in the amended final judgment. Further, the amended final judgment provided that it had disposed "of all issues and claims among all parties in this lawsuit." Thus, the amended final judgment was, in fact, final and appealable. *See Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 192–93, 205–06 (Tex. 2001).

*Alviar*, 395 S.W.2d 821, 823 (Tex. 1965); *Yarbrough v. Booher*, 174 S.W.2d 47, 49 (Tex. [Comm'n Op.] 1943); *Spicer*, 616 S.W.3d at 129–30; *see also Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994) (providing trial court's findings of fact reviewed for sufficiency under same standards used to review jury findings). Not only did the Firm proffer absolutely no evidence of its fees and costs under the UDJA, it also affirmatively disclaimed that it was requesting fees and costs under the UDJA. In fact, the Firm even suggested that any fees and costs awarded under the UDJA could be "move[d]" to a sanctions award as "an easy way to fix" the trial court's UDJA fees-and-costs award. Under these unique facts, we conclude that a remand for a redetermination would be inappropriate in light of the Firm's affirmative disclaimer of UDJA fees and costs and of its failure to adduce any evidence on the issue. *Cf. Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 314 (Tex. 2006) (holding remand appropriate remedy if evidence legally insufficient to support entire unsegregated attorney's-fees award because evidence of unsegregated attorney's fees was nevertheless some evidence of segregated attorney's fees); *Spicer*, 616 S.W.3d at 129–30 (reforming judgment to delete fees-and-costs award because prevailing party did not specifically plead for such an award).

## B. Exclusion of Valuation Evidence and Denial of Records Examination

Skeels contends that the trial court abused its discretion by excluding both his and Casparis's testimony regarding the appropriate valuation for Skeels's shares. Because we have determined that the Resolution controlled the Firm's share

redemption, vesting in the Firm's governing authority the discretion to set the terms of redemption, valuation evidence was not relevant. *See* Tex. R. Evid. 401. Thus, the trial court did not abuse its discretion. We overrule Skeels's fifth issue.

Similarly, the declaration that the Resolution authorized the Firm's share redemption rendered Skeels's request to examine the Firm's business records moot. Skeels's request was based on his narrower legal interpretation of the scope of the Resolution, which we have determined is incorrect. We overrule Skeels's third issue.

## C. Sanctions in Favor of Suder and Cooke

Skeels argues that the trial court erred by awarding Suder and Cooke $20,000 ($10,000 each) in sanctions based on a lack of good cause for such an award, which he contends was arbitrarily imposed and excessive.

In its findings and conclusions, the trial court stated that Skeels's pleadings violated Chapter 10 and Rule 13 because they were groundless, had been brought in bad faith, and were asserted to harass Suder, Cooke, and the Firm, which justified a "substantial" sanctions award. Although the trial court seemed to grant the Firm a sanctions award for Skeels's litigation conduct by considering the damages caused to the Firm, the amended final judgment awarded sanctions only to Suder and Cooke. The trial court awarded the Firm fees and costs under the UDJA but not sanctions.

### 1. Standard and Scope of Review

We review the trial court's sanctions award for an abuse of discretion. *See Low v. Henry*, 221 S.W.3d 609, 614, 619–20 (Tex. 2007). We may reverse the trial court's

ruling only if the trial court acted arbitrarily or unreasonably. *See id.* at 614; *see also Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009). However, we are not limited by the trial court's findings and conclusions and must independently review the entire record to determine whether an abuse occurred. *See Am. Flood Rsch., Inc. v. Jones*, 192 S.W.3d 581, 583 (Tex. 2006). The party seeking sanctions bears the burden to show that the opposing party's filings were groundless and that the pleadings were filed in bad faith or for the purpose of harassment. *See Nath*, 446 S.W.3d at 362–63; *GTE Commc'ns Sys. Corp. v. Tanner*, 856 S.W.2d 725, 729 (Tex. 1993) (orig. proceeding); *Mobley v. Mobley*, 506 S.W.3d 87, 94 (Tex. App.—Texarkana 2016, no pet.).

### 2. Fair Notice of Grounds for Sanctions

Skeels posits in a preliminary contention that the trial court abused its discretion by awarding sanctions under Chapter 10 of the Civil Practice and Remedies Code because Suder and Cooke specifically limited their pleaded sanctions requests to Rule 13. In their answers, Suder and Cooke, using identical language, cited Rule 13 as the sole authority for their sanctions requests and harkened back to the language of Rule 13 to support their requests:

> [Skeels's] suit against [Suder or Cooke] is groundless, brought in bad faith and for the purpose of harassment, and is without sufficient foundation in law or fact. Pursuant to Rule 13 of the Texas Rules of Civil Procedure, [Suder or Cooke] requests that the Court impose appropriate sanctions against [Skeels] for this frivolous pleading.

The record from the reconvened hearing confirms that the sanctions had been sought under Rule 13. Although it was unclear what the trial court was specifically

39

hearing—sanctions or UDJA attorney's fees—the Firm, Suder, and Cooke only mentioned Chapter 10 (or Rule 10 or Section 10) four times, and then it was only in passing. The gist of Suder's and Cooke's sanctions evidence was directed to the alleged "groundless" nature of Skeels's allegations, which is addressed in Rule 13 and not in Chapter 10. *Compare* Tex. R. Civ. P. 13, *with* Tex. Civ. Prac. & Rem. Code Ann. § 10.001. Attorney Two consistently referred to the sanctions requests as arising under Rule 13 and addressed them as such.

We conclude that Suder and Cooke failed to give Skeels fair notice that sanctions could be imposed under Chapter 10. *See Greene v. Young*, 174 S.W.3d 291, 300 & n.4 (Tex. App.—Houston [1st Dist.] 2005, pet. denied); *see also Bellow v. McQuade*, No. 09-16-00165-CV, 2017 WL 6559053, at *4 (Tex. App.—Beaumont Dec. 21, 2017, no pet.) (mem. op.) ("A court is not authorized to grant sanctions under a statute or rule that is not identified in the motion for sanctions."); *cf. Low*, 221 S.W.3d at 618 (holding party had fair notice sanctions were sought under Chapter 10 because request cited to Chapter 10 and because "the allegations made and relief sought are consistent with Chapter 10"). Accordingly, we will review the awarded sanctions through the lens of Rule 13.

### 3. Sanctionable Pleadings under Rule 13

Rule 13 authorizes sanctions against an attorney or his client if the attorney signs a pleading that is either (1) groundless and brought in bad faith or (2) groundless and brought for the purpose of harassment. Tex. R. Civ. P. 13; *Nath*, 446 S.W.3d at

40

362–63. A groundless pleading is defined as having "no basis in law or fact and not warranted by good faith argument for the extension, modification, or reversal of existing law." Tex. R. Civ. P. 13; *see GTE Comm'ns*, 856 S.W.2d at 730. This is more than merely pursuing a weak case; there must be no arguable basis for the cause of action. *See Falk & Mayfield L.L.P. v. Molzan*, 974 S.W.2d 821, 824 (Tex. App.—Houston [14th Dist.] 1998, pet. denied). In other words, "[g]roundlessness turns on the legal merits of a claim." *River Oaks Place Council of Co-Owners v. Daly*, 172 S.W.3d 314, 322 (Tex. App.—Corpus Christi 2005, no pet.). To determine if a pleading is groundless, a trial court is to use an objective standard in determining if a party or its counsel made a reasonable inquiry into the legal and factual bases of his claims at the time the pleading was filed. *See Lake Travis ISD v. Lovelace*, 243 S.W.3d 244, 254 (Tex. App.—Austin 2007, no pet.).

Against Suder and Cooke, Skeels raised a derivative breach-of-fiduciary claim in his original petition arising from Suder and Cooke's decision to fire Skeels, which he alleged was against the Firm's best financial interests. In his first amended petition, Skeels retained the derivative claim against Suder and Cooke and added a direct breach-of-fiduciary claim based on their alleged mismanagement of the shareholder profit-sharing agreement, which led to an alleged improper and inequitable profit distribution to Skeels. In his second amended petition, Skeels dropped the fiduciary-duty claims and alleged, in the alternative to his breach-of-contract claim against the

41

Firm,[17] that Suder and Cooke "conspired to obtain an unfair advantage or benefit by terminating [Skeels's] employment," leading to their unjust enrichment based on the "enhanced" profits occasioned by Skeels's legal work performed before he was fired but realized after he was fired.

The trial court found that these claims against Suder and Cooke were groundless:

> The Court finds that the claims asserted by Skeels were groundless and for an improper purpose. Skeels filed a derivative lawsuit on behalf of all of the shareholders of [the Firm] against Suder and Cooke, and a further breach of fiduciary duty claim and mismanagement only to drop those claims without any explanation or attempt to conduct discovery. Skeels'[s] deliberate attempt to include confidential information of both [the Firm] and its clients in the Original Petition and First Amended Petition (which Skeels personally verified), putting in motion an article in the *Texas Lawyer* to repeat these allegations, including the disclosure of confidential information, improperly seeking and obtaining an *ex parte* Temporary Restraining Order and including substantial inflammatory rhetoric, unnecessary to support any asserted cause of action, but merely to "play to the press" and embarrass and harass the [Firm, Suder, and Cooke], support this finding.
>
> . . . The claims in the Second Amended Petition are equally groundless. . . . There is also no basis to bring a claim for unjust enrichment against Suder and Cooke without any underlying cause of action against the individuals against whom that claim was made.
>
> . . . .
>
> . . . Skeels'[s] claims for breach of fiduciary duty, mismanagement, derivative claims on behalf of all the shareholders of [the Firm] were

---

[17]The breach-of-contract claim was based on Skeels's allegation that the Firm fired him in an attempt to avoid paying him his percentage of the business-litigation team's net profits for 2016 as had been past practice among the shareholders.

legally deficient at the time they were asserted and were not well grounded in law or fact. In essence, the "claim" was that Suder and Cooke breached their fiduciary duties to [the Firm] by firing Skeels, an "at will" employee. This claim has no merit on its face.

. . . .

. . . Reasonable inquiry would have negated the assertion of [the unjust-enrichment] allegation from the time it first was asserted.

. . . .

. . . Skeels'[s] Second Amended Original Petition does not assert unjust enrichment as a remedy against Suder and Cooke tethered to any cause of action asserted against Suder and Cooke[.]

. . . There is no allegation in Skeels'[s] Second Amended Original Petition that the corporate veil of [the Firm] should be pierced, or the type of fraud allegations necessary to make such an allegation (which is permitted in only . . . limited, exceptional circumstances).

. . . .

. . . Therefore, Skeels'[s] unjust enrichment allegation was legally deficient at the time it was asserted in Skeels'[s] Second Amended Original Petition and was not well grounded in law or fact.

### a. Fiduciary-Duty Claims

Regarding Skeels's claims in his original and first amended petitions against Suder and Cooke, the trial court's findings focused almost exclusively on Skeels's motivations for bringing suit against Suder and Cooke individually—that the claims were brought in bad faith or for the purpose of harassment—and not on the purported lack of legal or factual bases for these claims.

Similarly, Suder's testimony at the reconvened hearing regarding sanctions explored why Skeels had filed suit, which Suder posited was to embarrass and harass him and to get money from the Firm. Suder briefly testified that Skeels's claims against him and Cooke individually were groundless because they were based on the allegation that "we fired him on a case he worked on [i.e., *Lighting Ballast*] so we would not have to pay him a portion of a fee which was confidential that he disclosed," and that the compensation system in the business-litigation group "was that you got paid a percentage of the entire pot whether you worked on a case or not." However, because the Firm considered Skeels to have lost his status as a shareholder at the time the fee for *Lighting Ballast* was paid into the business-litigation group's profits, Skeels necessarily would not have been entitled to a percentage of those net profits. And that was the basis of Skeels's fiduciary-duty claims against Suder and Cooke—by ensuring Skeels was no longer a shareholder in the Firm, Suder and Cooke denied Skeels his percentage of the 2016 net profits with no just compensation for his shares, putting their interests above the Firm's.

Suder and Cooke attempted to specifically tie Skeels's fiduciary-duty claims to the *Lighting Ballast* fee and contended that Skeels had no more right to that fee than did any other profit-sharing shareholder in the business-litigation group. Skeels did not so limit his claims, instead alleging that he impermissibly was deprived of his shareholder right to the business-litigation group's net profits, not just of the *Lighting Ballast* fee.

In a related finding, the trial court averred that Skeels's derivative fiduciary-duty claim was based on the Firm's firing of an at-will employee—Skeels—which "has no merit on its face." But Skeels alleged that his termination was harmful to the Firm and that this harm, caused by Suder's and Cooke's actions, was a breach of their fiduciary duty to the Firm. This claim was at least a good-faith argument to expand existing at-will employment law in the context of corporate shareholders. *See, e.g.*, *Ritchie*, 443 S.W.3d at 886 ("There may be situations in which, despite the absence of an employment agreement, termination of a key employee is improper, for no legitimate business purpose, intended to benefit the directors or individual shareholders at the expense of the minority shareholder, and harmful to the corporation."). Thus, the claim cannot be considered groundless. *See* Tex. R. Civ. P. 13; *Lake Travis ISD*, 243 S.W.3d at 254–55; *McIntrye v. Wilson*, 50 S.W.3d 674, 687 (Tex. App.—Dallas 2001, pet. denied).

The trial court also found that because Skeels "drop[ped]" his fiduciary-duty claims with no explanation and no prior discovery, those claims were groundless when made. Skeels testified that he understood the fiduciary-duty claims were dropped from the second amended petition for strategic reasons. Suder and Cooke posited that the strategic reason was to get Skeels's "name and picture in the newspaper" and once that happened, the claims were not pursued. Skeels denied this assertion. However, a decision to amend a petition and drop a claim does not, on its own, render the dropped claim groundless when made. *See* Tex. R. Civ. P. 62

45

(providing that the purpose of an amendment is to add or withdraw something from a previous pleading "so as to perfect that which is or may be deficient, or to correct that which has been incorrectly stated by the party making the amendment"); *State v. PR Invs. & Specialty Retailers, Inc.*, 180 S.W.3d 654, 671 (Tex. App.—Houston [14th Dist.] 2005) (en banc op. on reh'g) (explaining superseded pleading must have been signed in violation of Rule 13 to be sanctionable), *aff'd*, 251 S.W.3d 472 (Tex. 2008); *cf. Mann v. Kendall Home Builders Constr. Partners I, Ltd.*, 464 S.W.3d 84, 91 (Tex. App.— Houston [14th Dist.] 2015, no pet.) (recognizing Rule 13 sanctions may be based on groundless and bad-faith or harassing statements in superseded pleading).

The trial court further found that the fiduciary-duty claims were groundless because Skeels included "inflammatory" and confidential factual allegations. But there is no indication that these allegations lacked a factual basis when alleged and, thus, were groundless. While Skeels's original and first amended petitions contained hyperbolic and presumably disconcerting factual allegations, there is no indication that they were without any basis in fact. Indeed, the trial court pointed to no specific factual allegation in these pleadings that was affirmatively baseless when alleged.

Skeels's fiduciary-duty claims, which were not included in his second amended petition, were not groundless. Indeed, Suder and Cooke do not argue in their appellate briefing that the fiduciary-duty claims were supported by no legal or factual basis. Instead, they stress the apparent bad-faith underpinnings for Skeels's decision

46

to file suit.[18]  We recognize that the trial court made many factual findings that Skeels's motivations for filing suit were to harass the Firm, Suder, and Cooke; were to force the Firm to either pay him for his shares or give him a larger portion of the *Lighting Ballast* fee; and were tied to his "specific animus for Suder."  But as we have concluded, Skeels's claims against Suder and Cooke were not groundless as that term is defined in Rule 13.  Opposing litigants rarely have affable relationships, and the facts leading to litigation generally and necessarily cause the type of hostility relied on by the trial court to impose sanctions here.  But if a plaintiff has a legal and factual basis for his claims, even if weak, the underlying personal motivations for filing suit are immaterial under Rule 13.  *See Nath*, 446 S.W.3d at 366 n.14 (noting "bad faith must be coupled with groundless pleadings to support sanctions under Rule 13").

### b.  Unjust-Enrichment Claim

Skeels's unjust-enrichment claim was pleaded in the alternative to his claim against the Firm for promissory estoppel, which was based on the Firm's promise that he would be included in the profit-sharing plan so long as he was a shareholder, which Skeels alleged would include the business-litigation group's net profits for 2016.  Against Suder and Cooke, Skeels alleged that they conspired to fire him in 2015 to avoid sharing the 2016 net profits, which were "enhanced significantly" by Skeels's

-----

[18]Suder and Cooke argue that the sanction was warranted because Skeels requested $1 million in damages in his original petition.  However, "[t]he amount requested for damages does not constitute a violation of [Rule 13]."  Tex. R. Civ. P. 13.

47

efforts, and he sought his unpaid net profits "as equitable relief." The trial court found Skeels's alternative unjust-enrichment claim "legally deficient" because no other cause of action was asserted against Suder or Cooke, Skeels did not allege that Suder and Cooke received a specific amount of money that they should not have received, and Skeels did not perform services for Suder and Cooke. In short, the trial court concluded that unjust enrichment, as pleaded by Skeels, "is not a cause of action."

Unjust enrichment is not a stand-alone cause of action; rather, it is an implied-contract, equitable measure of damages that addresses a failure to make restitution for benefits wrongfully received. *See Richardson Hosp. Auth. v. Duru*, 387 S.W.3d 109, 114 (Tex. App.—Dallas 2012, no pet.); *Christus Health v. Quality Infusion Care, Inc.*, 359 S.W.3d 719, 722–23 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (op. on reh'g); *Argyle ISD ex rel. Bd. of Trs. v. Wolf*, 234 S.W.3d 229, 246 (Tex. App.—Fort Worth 2007, no pet.). A party may recover under an unjust-enrichment theory if one party has obtained a benefit from another by fraud, duress, or the taking of unfair advantage. *See HECI Expl. Co. v. Neel*, 982 S.W.2d 881, 891 (Tex. 1998); *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992); *Denco CS Corp. v. Body Bar, LLC*, 445 S.W.3d 863, 876–77 (Tex. App.—Texarkana 2014, no pet.); *First Union Nat'l Bank v. Richmont Cap. Partners I, L.P.*, 168 S.W.3d 917, 931 (Tex. App.—Dallas 2005, no pet.).

Although Skeels styled his claim as an unjust-enrichment claim, his allegations viewed as a whole gave fair notice that he was attempting to make an equitable claim

48

for the return of money that he alleged Suder and Cooke had unfairly retained. *See* Tex. R. Civ. P. 45(b), 47(a); *Brumley v. McDuff*, 616 S.W.3d 826, 831 (Tex. 2021); *Richardson Hosp.*, 387 S.W.3d at 114. Such an equitable claim, falling under the umbrella of quantum meruit, money had and received, or the like, provides an independent legal basis for recovery. *See, e.g.*, *GRCDallasHomes LLC v. Caldwell*, 619 S.W.3d 301, 308 (Tex. App.—Fort Worth 2021, pet. denied); *Christus Health*, 359 S.W.3d at 722–23; *Edwards v. Mid-Continent Office Distribs., L.P.*, 252 S.W.3d 833, 837 (Tex. App.—Dallas 2008, pet. denied); David Dittfurth, *Restitution in Texas: Civil Liability for Unjust Enrichment*, 54 S. Tex. L. Rev. 225, 240–49 (2012). Even so, Skeels's unjust-enrichment claim was warranted by a good-faith argument for the extension, modification, or reversal of existing law that unjust enrichment is not an independent cause of action. *See, e.g.*, *Ritchie*, 443 S.W.3d at 882 ("[V]arious common-law causes of action already exist to address misconduct by corporate directors and officers [such as] unjust enrichment . . . ."); *Heldenfels Bros.*, 832 S.W.2d at 41 (suggesting "recovery under the theory of unjust enrichment" available as a cause of action); *Pepi Corp. v. Galliford*, 254 S.W.3d 457, 460 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) ("Unjust enrichment is an independent cause of action."); *City of Harker Heights v. Sun Meadows Land, Ltd.*, 830 S.W.2d 313, 318 (Tex. App.—Austin 1992, no writ) (recognizing equitable remedy of quantum meruit is "grounded in the principle of unjust enrichment" and is one of "many" legal and equitable remedies developed "to

49

avoid unjust enrichment");[19] Dittfurth, *supra*, at 250 ("Although the evidence suggests that the Texas Supreme Court has accepted [an independent unjust-enrichment claim], that court has not done so with such clarity as to end controversy on the issue."). Thus, Skeels's unjust-enrichment claim as pleaded was not groundless under Rule 13. *See Lake Travis ISD*, 243 S.W.3d at 254–56.

### 4. Summary of Holding Regarding Groundlessness

Skeels's fiduciary-duty claims and his unjust-enrichment claim were grounded in law, or at least a good-faith extension of existing law, and were supported by specifically pleaded facts. None of these facts were found to have been baseless when alleged. Suder and Cooke failed to meet their burden to objectively establish that Skeels's claims against them were groundless as that term is defined in Rule 13. Accordingly, the trial court abused its discretion by awarding sanctions against Skeels on the basis that his claims were groundless under Rule 13. And as we indicated above, because Skeels's claims were not groundless, we need not determine whether they were brought in bad faith or for the purpose of harassment. *See Nath*, 446 S.W.3d at 366 n.14. We sustain Skeels's sixth issue and reverse the trial court's award of sanctions against Skeels.

---

[19]In the trial court, Skeels cited this case as authority for his proposed jury questions on unjust enrichment against Suder and Cooke.

## IV. CONCLUSION

The plain language of the Resolution—a shareholder agreement—broadly allowed Friedman, Suder, and Cooke as the Firm's governing authority to take affirmative action on behalf of the Firm; thus, the trial court did not err by finding that the Resolution governed the redemption of Skeels's shares on the terms dictated by the Firm's governing authority. This conclusion renders moot Skeels's arguments that his valuation evidence was improperly excluded and that he was wrongly denied his asserted statutory right to examine the Firm's business records to determine the value of his shares. However, we conclude that the Firm failed to proffer any evidence of its UDJA attorney's fees and costs while affirmatively disclaiming its pleaded request for such fees and costs. Similarly, the record does not show that Skeels's claims were groundless when made, rendering the trial court's award of sanctions in favor of Suder and Cooke under Rule 13 an abuse of discretion.

Accordingly, we affirm the trial court's September 11, 2017 order granting the Firm's counterclaim for declaratory judgment and denying Skeels's claim for declaratory judgment. *See* Tex. R. App. P. 43.2(a). We modify portions of the trial court's January 7, 2018 amended final judgment to delete the Firm's award of attorney's fees and costs under the UDJA and to delete the award of sanctions in favor of Suder and Cooke. As modified, we affirm the trial court's amended final judgment. *See* Tex. R. App. P. 43.2(b); *Spicer*, 616 S.W.3d at 128–29, 132; *McIntyre*, 50 S.W.3d at 688–89.

/s/ Dana Womack

Dana Womack
Justice

Delivered:  October 14, 2021